UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
A.M., on Behalf of J.M.,

        Plaintiffs                  **MEMORANDUM & ORDER**

       - against -                 08 CV 1962 (RJD)(LB)

NYC Department of Education; School District 29;
P.S./I.S. 270Q; NYC Department of Health and
Mental Hygiene; Office of School Health; Office of
School Food Services; Chancellor Joel Klein;
Superintendent Joanne Joyner-Wells; Principal
Eleanor Andrew; the City of New York ("DOE"),

              Defendants.
-------------------------------------------------------------x
DEARIE, District Judge.

## I. INTRODUCTION

      J.M. is a student diagnosed with Type 1 Diabetes Mellitus and at the time this action was

filed in March 2008, was a twelve year-old seventh grader at Public School 270Q ("P.S. 270"),

located in District 29 of the New York City Department of Education (the "DOE"). A.M. (the

"parent") commenced this action *pro se* on behalf of herself and her son, J.M. (collectively "the

plaintiffs"), against the City of New York, the DOE, School District 29, P.S. 270, the New York

City Department of Health and Mental Hygiene ("DOHMH"), the New York City Office of

School Health, the New York City Office of School Food Services ("OSFS"), and School

Chancellor Joel Klein, District 29 Superintendent, Joanne Joyner-Wells, and P.S. 270 Principal

Eleanor Andrew in their individual and official capacities (collectively the "defendants"). The

plaintiffs allege substantive and procedural violations of Section 504 of the Rehabilitation Act of

1973 ("Section 504"), 29 U.S.C. § 794, *et seq.*, the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12111, *et seq.*, the Individuals with Disabilities Education and

Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing

regulations, New York State and New York City Education Laws, as well as claims under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and other regulations[1] and international instruments or treaties.[2] The plaintiffs allege that these violations give rise to viable claims under Section 1983 of the Civil Rights Act of 1871("Section 1983"), 42 U.S.C. § 1983. In addition, the plaintiffs allege pendent state claims for intentional and negligent infliction of emotional distress.

The thrust of plaintiffs' complaint is that the defendants to varying degrees failed to accommodate J.M.'s specialized dietary needs (a result of his new diabetes diagnosis) by unreasonably refusing to (1) heat up J.M.'s homemade food using the school microwave and (2) supervise J.M.'s food intake during school lunch. In so doing, plaintiffs allege that the defendants discriminated against J.M., denied J.M. a "free appropriate public education," and violated the student's and parent's substantive and procedural rights. Defendants move for summary judgment. For the reasons set forth below, defendants' motion is GRANTED in its entirety.

---

[1] See ECF Docket #3, Exhibit ("Exh.") 2, Complaint ("Compl.") ¶ 10 ("[J.M.] . . . is protected under . . . the United States Department of Agriculture's Child Nutrition Programs"); Id. ([J.M.] is also protected under . . . the American Diabetes Association regulations."). The Court will not address either of these claims. The Department of Agriculture's Child Nutrition Programs are Department initiatives, not regulations, which do not form an independent basis upon which to seek relief. The American Diabetes Association is a 501(c)(3) nonprofit charity, whose "regulations" do not form any basis upon which to seek relief.

[2] See Compl. ¶ 10 ("[J.M.] is further protected under international laws such as the Declaration of Geneva of 1923, the United Nations Convention on the Rights of the Child (CRC), and UNICEF."). The Court declines to address any of these claims. The Declaration of Geneva of 1923 was what ultimately led to the drafting of the CRC and does not form any independent basis upon which to seek relief. The United States has not ratified the CRC and so the court need not address whether the treaty itself creates a private right of action. See, e.g., Katel Ltd. Liab. Co. v. AT & T Corp., 607 F.3d 60, 67 (2d Cir. 2010) ("There is a presumption that treaties do not create privately enforceable rights in the absence of express language to the contrary.") (internal quotations and citations omitted). Lastly, UNICEF is a UN body, not an "international law." Compl. ¶ 10.

## II. BACKGROUND

I have liberally construed the disjointed record and its less than cohesive presentation in the parties' papers. The most essential facts are largely undisputed, except where indicated.[3]

### A.  Diabetes Diagnosis

On March 26, 2007, J.M., then 11 years old and in the sixth grade, was hospitalized at Schneider Children's Hospital ("Schneider") and diagnosed a day later with Type 1 Diabetes Mellitus. Compl. ¶¶ 4-6. There is no indication that J.M. had previously suffered from any disabilities that interfered with his learning or access to school. Much the opposite, both before and after his diabetes diagnosis, J.M. was able to participate fully in his educational program at P.S. 270 with no restrictions, including gym class, school clubs, and activities, Def. R. 56.1 ¶ 11, and was "on grade level for reading and math." Def. R. 56.1 ¶ 24. It is also undisputed that diabetes is a lifelong, debilitating illness that requires treatment, medication, and close monitoring. See Opp. Mem. at 5, 24.

Between March 27 and March 29, 2007, while J.M. was still hospitalized, the parent reached out to P.S. 270 Assistant Principal, Andrea Belcher ("Ms. Belcher"), and the school's Guidance Counselor, Sonya Spurling ("Ms. Spurling"), notified them of J.M.'s hospitalization and his diagnosis, and also discussed steps to "easy (sic) [J.M.]'s transition from the hospital to

---

[3]  I note at the outset that although the plaintiffs were provided with the requisite "Notice to Pro Se Litigant Who Opposes a Summary Judgment" pursuant to Local Civil Rule 56.2, see ECF Docket #75, plaintiffs' Memorandum in Opposition to Summary Judgment ("Opp. Mem.") did not in any way conform to Federal Rule of Civil Procedure 56 and plaintiffs' Local Rule 56.1 statement ("Pl. R. 56.1") did not specifically respond or controvert any of the "undisputed facts" presented in defendants' Rule 56.1 statement ("Def. R. 56.1"). Instead, plaintiffs' Rule 56.1 statement merely attaches twenty-two documents, the vast majority of which are duplicative of evidence appended to the original complaint, and asks the court to "review the herein documents/proof/evidence in conjunction with the plaintiff's (sic)" Memorandum in Opposition to Summary Judgment, which totals sixty-six pages. See Pl. R. 56.1, at 1.

school and home." Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, Ms. Spurling, 3/29/2007.

### B. Request For and Implementation of Glucose Monitoring

Chief among these transitional steps was the completion of a "Glucose Monitoring and Authorization for Administration of Medication to Students" Form ordered and signed on March 28, 2007 by J.M.'s primary physician and endocrinologist at Schneider, Doctor Paula Kreitzor ("March Glucose Form"). Def. R. 56.1, Exh. D, Hearing Officer's Findings of Fact and Decision ("FFD"), at 4.[4] On March 29, 2007, the parent faxed the form to P.S. 270, just hours before J.M.'s earlier-than-expected discharge from the hospital. Opp. Mem. at 5.

A glucose monitoring form and order is typical for students with diabetes in New York City and school nurses "regularly perform such monitoring pursuant to physicians' orders." Def. R. 56.1, Exh. B, Declaration of Gary Krigsman, M.D., Supervising Physician in the Bureau of School Health ("Krigsman Decl.") ¶¶ 5-6. Students with diabetes are "[g]enerally . . . able to participate in the school educational program without any special accommodation," save for this kind of "daily blood sugar testing to monitor glucose levels, and provision for appropriate interventions (such as giving the student snacks, or administering medications ordered by the student's physician) in the event the student's glucose levels fall outside the acceptable range." Id. ¶ 7. DOHMH, a named defendant in this matter, is responsible for carrying out the orders pertaining to glucose monitoring, the administration of medication, and other medical interventions. Id. ¶ 6, 12.

---

[4] The Court could not locate the hard copy of the March Glucose Form in either of the party's papers, but the DOE Impartial Hearing officer ("IHO") who ultimately reviewed this case included the relevant content of the form in his FFD.

4

The March Glucose Form stated that J.M. "may need help" monitoring his own blood glucose levels; that if his blood glucose levels remained between "70 and 250," "no action" would be needed; that if his blood glucose dropped below "70," he was to be given "4 oz of juice plus a snack;" and that if his blood glucose was elevated above "250," he would have to drink water and his parent would have to be called. FFD at 4. Although the physician's order "did not provide for administration of insulin for elevated glucose levels . . . as is often requested," the order "did provide for the administration of glucagon for hypoglycemia, but this intervention was never required." Krigsman Decl. ¶ 9.

When J.M. returned to school on March 30, 2007, J.M.'s father provided the school with an additional copy of the March Glucose Form, along with a "diabetic package" required to implement the Form, which included a "blood glucose meter, strips, lancets, log book, glucose tablets, glucose gel, glucagon emergency kit, 4 oz. juice boxes, packaged snacks and emergency numbers." Opp. Mem. at 6. The school and its school nurses fully complied with, and even went beyond, what the March Glucose Form required through J.M.'s graduation from P.S. 270 in 2009: Daily monitoring of blood glucose levels, see Pl. R. 56.1, Exh. 1, Office of School Health Diabetic Services Worksheets, 4/11/2007 – May 20, 2009 ("Glucose Worksheets"),[5] daily calls from school nurses near the beginning of monitoring, Id.; see also Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/20/2007 ("I would like to highlight that both nurses have been very good to my son. They had (sic) called me every day to report [J.M.]'s glucose levels."), and frequent check-ins with the parent by phone whether or not J.M.'s blood glucose levels were too

---

[5] The Plaintiffs' Memorandum in Opposition to Summary Judgment points out a "number of discrepancies in the school's glucose monitoring records," including, but not limited to, two months where there is no record of monitoring at all (September 2007 and October 2008). Opp. Mem. at 28-29. These "discrepancies," however, are no more than *de minimus* and likely due to oversight during the discovery process (the records were produced pursuant to subpoena), rather than negligence. Moreover, the data sheet, dated 10/1/2007 – 10/24/2007, includes a note that "Mother [was] informed 504 services in place and has (sic) been since 9/4/2007." Glucose Worksheet at AM15.

high or low. <u>See</u> Glucose Worksheets. Although J.M.'s levels were never sufficiently reduced or elevated to require emergency action, the school nursing staff, pursuant to standard procedures, contacted the parent in each instance where the student's blood sugar levels were erratic. Def. R. 56.1 ¶ 10.

### C.  Request and Denial of Request to Heat J.M.'s Homemade Lunches

The parent sent homemade lunches with J.M. upon the advice of J.M.'s Schneider nutritionist. ECF Docket # 3, Exh. 4, Impartial Hearing Request, 5/4/2007 ("IHR") at 1. This was to enable the parent and J.M.'s doctors to monitor his diet—specifically his caloric/carbohydrate intake—at least until J.M. became more accustomed to his "new situation." <u>Id.</u> According to a letter from the Coordinator of the New York State Child Nutrition Program Administration, upon which both parties rely, sending lunch from home is one of the primary ways in which students with diabetes "handle lunchtime well at school." Pl. R. 56.1, Exh. 8; Def. R. 56.1, Exh. C, Letter from Francis O'Donnell to the parent, 8/2/2007 ("O'Donnell Letter") at 2. In order to help students with diabetes "to be as independent as possible over time in his/her self-care of diabetes," students also may eat a school lunch or combine food from home with "purchased items at school." <u>Id.</u> The "DOE post (sic) on its website a table of product descriptions, brands, portion size, calories, cholesterol and total carbohydrates concerning the lunches served at school." FFD at 6 (citing testimony by District 29 Superintendent Joyner-Wells). The DOE provided food that could meet the special dietary restrictions of students like J.M. and sending homemade food was but one of several options available to J.M.'s parent. <u>See</u> O'Donnell Letter ("There have always been adequate choices in a school menu for [diabetic] students to eat an appropriate and healthy lunch."); FFD at 22 ("The evidence clearly established that there is a variety of choices for [J.M.] concerning the school lunches. . . . [T]he student's school lunches

could be easily planned from the nutritional information contained on the DOE website and school menus.").

On April 12, 2007, the parent reached out to Ms. Belcher via email and without explaining why, asked "whether [J.M.] can warm up his lunch using a microwave." Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/12/2007. Ms. Belcher agreed to do so and directed Ms. Spurling, to heat J.M.'s homemade food using the microwave in the teacher's lounge. See Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/20/2007; Pl. R. 56.1, Exh. 5, NYC DOE Impartial Hearing Transcript ("IH Tr.") at 203-04; Def. R. 56.1, Exh. A, Declaration of Eleanor S. Andrew, Principal of P.S. 270 ("Andrew Decl.") ¶ 7.

Although diabetics must monitor their food intake, there is no medical necessity for them to consume hot food. Def. R. 56.1 ¶ 7. Rather, the parent wanted J.M.'s food to be heated so that he would be more inclined to eat hot homemade food that may have cooled off by lunchtime, despite his use of a thermos. As the parent explained, "He carries his food in an insulated bag/pack, but it does not keep it hot enough until his lunch time. I could send cold food with multiple ice packs and keep it safely cold, but I do not want him to eat sandwiches every single day." IHR at 1. Because his meals were strictly measured to maintain ideal blood glucose levels, it was important that J.M. eat *all* of his meals.  FFD at 7 (citing testimony of Dr. Carl Barberis).

Between April 12 and April 20, 2007, the parent reached out to two different school nurses, one of whom was an employee of DOHMH, and also spoke with J.M. to inquire whether the school was actually heating his lunch and was informed that J.M. did not always have access to the microwave and on occasion "had sometimes eaten [his lunch] cold." Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/20/2007. When the parent asked one of the school

nurses by phone whether the parent would need to "seek 504 documents[6] to ensure that [J.M.]'s nutritional needs are met at school," the nurse could not provide an answer at that time. Id. The parent's growing concern was amplified when on April 19, 2007, J.M. came home with some of his lunch left uneaten, Id., and on April 20, 2007, the parent was called by a school nurse to alert her that J.M.'s blood glucose count had been low prior to lunch (70), Opp. Mem. at 9, although J.M. did not require emergency action at the time. See Def. R. 56.1 ¶ 10.

These two incidents prompted a much more forceful email on April 20, 2007 from the parent to Ms. Belcher about access to the school microwave and ended with a question: "If my son is not allowed to warm up his lunch, can the school provide a balanced-lunch for him?" Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/20/2007. It is unclear from the record whether this question constituted a formal request and if so, what the parent expected of the school at that time given that J.M.'s nutritionist had advised that the parent supply J.M.'s lunch from home in the short term and the parent had specifically apprised Ms. Belcher of this fact.[7] The parent sent another email on April 21, 2007 reiterating her request that the school heat J.M.'s meals and listing specific dates and times that Ms. Spurling had failed to heat up J.M.'s food. Opp. Mem. at 10.

That same day, the parent contacted J.M.'s pediatrician, Carl Barberis, and expressed her concerns about the school's inconsistent implementation of her lunch heating request. Doctor Barberis, in turn, filled out another glucose monitoring form ("April Glucose Form"), apparently without consulting J.M.'s Schneider physician, as well as a request form for "504 Accommodations," both of which the parent faxed to the school. Pl. R. 56.1, Exh. 1, at AM1-

---

[6] The parent was apparently referring to documents required under the DOE regulations implementing Section 504 of the Rehabilitation Act.
[7] According to the parent, she also forwarded J.M.'s meal plan—developed by his nutritionist—to the school. Opp. Mem. at 10.

AM3.[8] The "504 Accommodations" request form did not include an order or request to heat J.M.'s lunch, nor did it request anything else specific, reiterating only J.M.'s general need for "accommodation for special dietary needs in school + blood glucose monitoring." Pl. R. 56.1, Exh. 1, at AM3. Rather, Dr. Barberis wrote on the April Glucose Form: "[S]taff must supervise child during lunch/snack time to make sure he ingests adequate amount of food to prevent hypoglycemia." Pl. R. 56.1, Exh. 1, at AM1. The April Glucose Form included no blood glucose monitoring instructions as is customary; the *only* content on the form was the order regarding supervision. See Id.[9]

The April Glucose Form and 504 accommodations request forms were received by the school nursing staff, and subsequently, sent to DOHMH because the supervision accommodation was "not something that is considered a nursing function." See IH Tr. 255-57 (Testimony of Sharon Hall, School Nurse Supervisor); Id. at 487-88 (Testimony of Sharon Braxton, DOHMH Nurse); FFD at 6, 15. Although DOE Regulation A-710, "Section 504 Policy and Procedures for Students" ("DOE 504 Regulations") requires that a "504 Team" be convened, with parental participation, "within thirty (30) school days of receipt of an initial written request for §504 Accommodations," in part to develop a "504 Plan," and the defendants concede as much, Def. R. 56.1 ¶ 3, no meeting was ever held, no formal "504 Plan" was ever developed for J.M., and no

---

[8] The Court recognizes that there is an ongoing factual dispute over whether the school ever received these two documents, but most importantly, the April Glucose Form with the supervision request. I will resolve this dispute in favor of the plaintiffs, but only to the extent that the school received the documents and forwarded them onto the regional office of DOHMH. Two different school nurses acknowledged receipt of the form during testimony under oath in the impartial hearing in this matter and testified that they sent the forms onto DOHMH. Moreover, it was the defendants themselves who supplied the documents in response to a *subpoena* issued by the plaintiffs. See Pl. R. 56.1, Exh. 1, at AM1.

[9] I note that the IHO found that the "form, as prepared by Dr. Barberis, appears to have been prepared without independent consideration by him, as does (sic) not contain the specific detailed information included in the 504 prepared in March." FFD at 21.

written decision was provided to the parent.[10] Compl. ¶¶ 40, 46, 50, 54; DOE 504 Regulations §

(IV)(B)(1), (V).

Instead, on April 25, 2007, the parent received a call from Joanne Joyner-Wells, the

Superintendent of District 29 and one of the named defendants in this matter, who denied the

parent's accommodation request to heat up J.M.'s lunch. Opp. Mem. at 11. The Superintendent

cited "potential liability (as the food could be overheated or spoiled)" on the part of Ms. Spurling

and other school staff and the lack of "facilities or manpower" to provide for the

accommodation. Def. R. 56.1 ¶ 20.[11] The Superintendent discussed alternative options with the

parent, such as "training [the] student to make appropriate menu choices," Def. R. 56.1 ¶ 21,

including counting carbohydrates from the school's menu, Opp. Mem at 11, or if uncomfortable

with the school's lunches, "bring[ing] homemade lunches in a thermal container." Def. R. 56.1 ¶

21. There is no evidence to suggest that the parent discussed the issue of supervision of J.M.'s

food intake with the Superintendent. See Opp. Mem. at 11. Despite the parent's protestations, the

conversation concluded with Ms. Joyner-Wells reiterating her denial of the parent's request to

heat J.M.'s food.

At the time of the phone call, the Superintendent had not received either the March or

April Glucose Forms, written requests for any accommodations, or any other documentation.

Apparently, when Principal Andrew of P.S. 270 discovered that Ms. Spurling had been heating

up J.M.'s lunch, the Principal "discussed this matter with [the Superintendent], and with her

---

[10] A Section "504 Plan" is distinct from a Section 504 Request "Form." See DOE 504 Regulations § (V)(A) ("If the §504 Team determines that accommodations are required, it shall draft a §504 Plan for the student. The Plan shall specify the names and titles of the §504 Team participants, the materials considered in reaching the decisions, and the accommodations that will be offered to the student.").

[11] The Superintendent's expressed concerns echoed later testimony during the impartial hearing by the Nutrition Coordinator for the OSFS who stated in relevant part that it was not feasible for school cafeterias, with limited staff and strict schedules, to heat up food for particular students; moreover, providing such an individual service would not conform to the OSFS's strict sanitation and food safety practices. Def. R. 56.1 ¶ 23.

concurrence immediately directed staff to cease this practice." Andrew Decl. ¶ 7. The Superintendent's knowledge of J.M. and his condition was limited to his parent's request to heat his lunches. The phone call was the only point of contact between the parent and the Superintendent prior to the impartial hearing. FFD at 4.

Following this conversation, the parent sent another email to Ms. Belcher dated April 25, 2007, reiterating her request to accommodate J.M. by heating his food, but the email was also quite conciliatory, thanking the Assistant Principal for "reply[ing] to my e-mails. I really appreciate your feedback and diligence," and stating that "I have nothing against the school and its officials. I admire and respect you." Pl. R. 56.1, Exh. 3, Email from the parent to Ms. Belcher, 4/25/2007. When the parent did not receive a reply to this email, Opp. Mem. at 11, she emailed DOE School Chancellor, Joel Klein on May 1, 2007[12] and then on May 3, 2007, emailed the United States Department of Education, Office of Civil Rights, emailed and had a phone conversation with the DOE Office of School Improvement, and phoned the DOE Office of Legal Services and spoke with a DOE attorney, who informed the parent that "there are no provisions that mandate accommodations for students with special needs/disabilities who need to heat up their lunch." See Pl. R. 56.1, Exh. 3, Email from the parent to Office of School Improvement, 5/3/2007.

Each of the emails described J.M., his condition, and the parents' failed efforts to get the school to agree to heat J.M.'s food. The emails reveal a concerned parent, just one month into the reality of her son's lifelong illness, deeply frustrated by what she perceived to be a breakdown in communications and unreasonable obstacles blockading the health of her son. Importantly, the emails again reinforce the fact that the parent's *lone* concern, at least at that time, was the

---

[12] This email is the only alleged point of contact between the plaintiffs and the Chancellor.

requested accommodation to heat J.M.'s food, as opposed to direct supervision of his meals by school staff, a concern never mentioned in any of the extensive correspondence.

### D. Impartial Hearing

On May 4, 2007, the parent requested an impartial due process hearing[13] to challenge the DOE's refusal to heat J.M.'s homemade lunches, asserting that the DOE had violated Section 504, and also mentioning, without specifying whether she was alleging any violation of, the IDEA. See IHR at 1. The DOE did not submit an answer to the parent's request. See 8 N.Y.C.R.R. § 200.5(a) (requiring answer).

The Impartial Hearing took place over the course of five dates on May 21, June 4, June 14, June 27, and July 13, 2007, Def. R. 56.1 ¶ 13, and comprised nearly 600 transcript pages of testimony. See Pl. R. 56.1, Exh. 5. The parent, proceeding *pro se*,[14] called four witnesses: Superintendent Joyner-Wells, P.S. 270 school nurse supervisor, Sharon Hall, Dr. Carl Barberis, and herself. She also submitted forty-eight documents into evidence, FFD at 3, the majority of which were also submitted to this Court in the instant matter. The DOE called three witnesses: P.S. 270 Principal Andrew, the Nutrition Coordinator for OSFS, Herman McKie, and a P.S. 270 nurse employed by DOHMH, Sharon Braxton, and submitted its own evidence. FFD at 10-16.

---

[13] New York's Regulations of the Commissioner of Education provide: "A parent or school district may file a due process complaint with respect to any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student." 8 N.Y.C.R.R. § 200.5(i).

[14] Prior to the start of the impartial hearing, the IHO encouraged the parent to seek out legal representation, but the parent was unable to retain counsel. FFD at 3 (citing IH Tr. 291). After the hearing began, the parent requested that she be "appointed an attorney." Id. (citing IH Tr. 290). The request was denied because there were "no provisions under the relevant law providing for the appointment of an attorney other than a guardian ad litem . . .." Id. See 8 N.Y.C.R.R. § 200.5(j)(3)(vii) ("The parties to the proceeding *may* be accompanied and advised by legal counsel and by individuals with special knowledge or training with respect to the problems of students with disabilities.") (emphasis added). The IHO appropriately determined that the conditions required to appoint a guardian ad litem— i.e. where "the interests of the parent are opposed to or are inconsistent with those of the student," 8 N.Y.C.R.R. § 200.5(j)(3)(ix)—were not present in this case. FFD at 3.

Although the parent's request for the impartial hearing was limited to the narrow issue of heating J.M.'s homemade lunches, the questioning and testimony during the hearing often went far afield from that particular issue. Topics ranged from the more germane (i.e. whether the school ever took appropriate action in response to the April Glucose Form, including supervising J.M.'s lunch), see, e.g., IH Tr. 257-58, to the extraneous (i.e. allegations of "concealment of evidence," IH Tr. 403, or that the Principal interfered with her daughter's school lottery choice as retaliation for her lunch heating requests on behalf of her son), see e.g., IH Tr. 99.

The IHO's decision was rendered on November 16, 2007[15] and was limited solely to the issue of reheating J.M.'s food under Section 504.[16] Although the IHO concluded that the requested accommodation was "reasonable," and would not present any "undue hardship" to the DOE, and that the decision not to reheat the student's food was made "arbitrarily and capriciously in this instance," he still found against the parent under Section 504. FFD at 21. His decision rested on the fact that "the record does not support a finding that the accommodation is necessary." FFD at 22. In support of this assertion, the IHO cited evidence demonstrating that diabetics do not "need[] to eat hot food," the "variety of choices for the students concerning the school lunches," including that "the student's school lunches could be easily planned from the nutritional information contained on the DOE website and the school menus," and the dearth of "evidence that the student has been harmed" because of the DOE's refusal to honor the parent's request. FFD at 22.

---

[15] Although plaintiffs are correct to allege that the IHO's decision was untimely, see 8 N.Y.C.R.R. § 200.5(5) ("[T]he impartial hearing officer shall render a decision . . . not later than 45 days from the date required for commencement of the impartial hearing"), relief is only warranted if the "forty-five-day rule violation affected [the student]'s right to a free appropriate public education." J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000). As will be discussed below, however, J.M.'s rights under the applicable statutes were not violated and, therefore, the IHO's delay is immaterial to the disposition of this case.

[16] See 8 N.Y.C.R.R. § 200.5(j)(1)(ii) ("The party requesting the impartial due process hearing shall not be allowed to raise issues at the impartial due process hearing that were not raised" in the original due process request).

On January 18, 2008, the parent appealed the IHO decision to the State Review Officer ("SRO"). On February 21, 2008, the SRO dismissed the parent's appeal for lack of Subject Matter Jurisdiction to review Section 504 claims. ECF Docket # 3, Exh. 6, SRO Decision, Appeal No. 08-002 at 3 ("New York State Education Law makes no provision for state-level administrative review of hearing officer decisions in Section 504 hearings and a [SRO] does not review section 504 claims.").[17]

### E. Remaining Material Facts

On June 21, 2007, during the pendency of the impartial hearing, Dr. Kreitzor submitted an updated Glucose Monitoring Form, which repeated the exact monitoring instructions she originally provided in March. ECF Docket # 3, Exh. 16 at 5-6. Notably, the form did not include the order for staff supervision of lunch, which had been included in Dr. Barberis's April Glucose Form, nor any order or request related to food heating. See Id.

On July 3, 2007, during the pendency of the impartial hearing, the parent sent a letter to the Chairperson of the Committee on Special Education, requesting an independent evaluation of J.M. pursuant to the IDEA, Section 504, the ADA, and the U.S. Department of Agriculture/Food Nutrition Serves. Pl. R. 56.1, Exh. 15. The parent never received a response to this request.

On July 13, 2007, on the last day of testimony in the impartial hearing, the parent hand delivered to Dr. Krigsman of DOHMH the same Glucose Monitoring and Accommodation Request Forms signed and already provided by Dr. Barberis on April 21, 2011. The only material difference was that the forms were dated July 12, 2007 and included an attached letter from Dr. Barberis again requesting the "availability of a microwave at school" and that the school "serve a

---

[17] Under New York State education law, the SRO's jurisdiction is limited to matters arising under the IDEA or its state counterpart. See 89 N.Y. Educ. L. 4404(2).

school lunch in compliance with his dietary needs." Pl. R. 56.1, Exh. 13. The parent followed up several times with various DOE employees to check on the status of the renewed request. See ECF Docket # 3, Exh. 19, Impartial Hearing Request, 12/26/2007 (IHR II) at 2.

There is a dispute over whether a "504 Meeting" was actually convened in October 2007. The defendants allege that "there was a meeting scheduled to discuss the student's needs and develop an appropriate '504 Plan,'" and that "the Borough Nursing Director of the Office of School Health, the nursing supervisor and school nurse, the Department of Education Health Director, and a school administrator" appeared, but that the parent "failed to attend." Krigsman Decl. ¶ 10; Andrew Decl. ¶12. The parent contends that no such meeting was ever scheduled or held and accuses the defendants of manufacturing these declarations "in an effort to cover their own negligence in honoring their obligations to me and my son." Opp. Mem. at 54.

On October 25, 2007, the parent received a written decision from Janice Blake, the DOE Health Director, in response to the forms the parent had submitted on July 13, 2007. ECF Docket # 3, Exh. 16, Letter from Blake to the parent, 10/25/2007. The letter again denied the parent's request to have J.M.'s food heated and also denied the request for J.M. to be monitored as he eats. As to the latter point, Ms. Blake stated: "All lunch periods are under the supervision of school (sic) lunch aide and other school staff. The school lunch aide monitors the lunch period to ensure the safety and security of all students is maintained." Id. at 2. The letter also reiterates that "menus are available for review by contacting the school food staff . . . or visiting the [OSFS]'s website . . . or by entering 'school food' in the search box of the [DOE]'s website." Id. at 1.

On December 26, 2007, the parent filed another request for an impartial hearing to challenge the DOE's "failure to implement . . . my requests for my son . . . to have Special

Dietary Accommodations under Section 504 and other statutes for the *2007-2008* School Year."

IHR II at 2 (emphasis added). Despite following up by letter, several emails, and a phone call to

the impartial hearing office, <u>see</u> ECF Docket # 3, Exh. 19 at 3-5, Letter to Impartial Hearing

Office, 1/22/08, Emails to Impartial Hearing Office, 1/23/08, 2/4/08, and resubmitting the

impartial hearing request on January 23, 2008, no hearing date was scheduled. Compl. ¶ 70.

### F.  Instant Matter

On March 7, 2008, the parent initiated the current action, *pro se*, on behalf of herself and

her son, J.M. in the Southern District of New York. Shortly thereafter on April 29, 2008, the case

was transferred to the Eastern District of New York. <u>See</u> ECF Docket #3, Exh. 3. Although the

complaint was originally styled as an appeal of the administrative decisions of the IHO and SRO,

the complaint went far beyond the scope of such an appeal.[18] On August 26, 2009, the

defendants moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6),

ECF Docket # 25, the plaintiff responded, ECF Docket # 27, and the defendants filed a reply.

ECF Docket # 28. On March 1, 2010, I ordered that this motion be re-submitted as a motion for

summary judgment with no disagreement by either party. <u>See</u> ECF Docket # 35. The defendants

moved for summary judgment on April 27, 2010, ECF Docket # 74, the plaintiffs responded on

November 30, 2010, and the defendants filed a reply on January 13, 2011. ECF Docket # 78.

---

[18] Both parties briefed this matter as a plenary action, as opposed to merely an appeal from the IHO's decision and defendants marshaled no law to suggest that plaintiffs' claims outside the scope of the administrative hearing must be dismissed. Given that I must "read a *pro se* pleading to suggest the strongest arguments that can be made," <u>Weixel v. Bd. of Educ.</u>, 287 F.3d 138, 141 (2d Cir. 2002), I will treat the plaintiffs' complaint as a plenary action. Nevertheless, I will still afford "due weight" to the administrative proceedings below "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>Walczak v. Fla. Union Free Sch. Dist.</u>, 142 F.3d 119, 129 (2d Cir. 1998) (internal brackets, quotations, and citations omitted).

# III. DISCUSSION

## A. Standard of Review

Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-50, 255 (1986)). The party opposing summary judgment must set forth evidence demonstrating a genuine issue for trial, and may not rely only on allegations in its pleadings. Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006) ("[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment."). When, as here, a litigant is proceeding *pro se*, I must "read his supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Nonetheless, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

## B. Preliminary Matters

Before considering the merits of the plaintiffs' claims, it is necessary to address the plaintiffs' standing as *pro se* litigants and the availability of their requested remedies.

### 1. Whether the Parent Has Standing to Proceed *Pro Se* on Behalf of Herself and/or Her Minor Son

Plaintiffs are proceeding *pro se*. Construing the plaintiffs' papers liberally, the parent initiates claims both on behalf of herself and on behalf of J.M. principally pursuant to the IDEA, Section 504, and the ADA. See Compl. ¶ 3.

Although the issue was neither raised nor briefed, I will first address whether the parent may assert claims *on her own behalf* under the IDEA, Section 504, and the ADA. See Cent. States Se. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 433 F.3d 181 (2d Cir. 2005) ("Because the standing issue goes to [a] Court's subject matter jurisdiction, it can be raised sua sponte.")

In Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516 (2007), the Supreme Court held that parents have standing "to prosecute IDEA claims on their own behalf" in federal court based upon both procedural violations of the Act and the substantive denial of a "free appropriate public education" to their children. Id. at 533-535. The parent, therefore, does have standing to bring IDEA claims on her own behalf. The thornier issue is whether the parent may do so under Section 504 or the ADA.

Since Winkelman, federal courts have disagreed over whether the Supreme Court's decision to confer independent parental standing under the IDEA extends equally to claims brought by parents on their own behalf under Section 504 and the ADA. Courts limiting Winkelman to the IDEA have relied primarily on the fact that the decision was "too closely tied to the text and structure of the IDEA to apply equally to the ADA and the Rehabilitation Act." Hooker v. Dallas Indep. Sch. Dist., No. 3:09-CV-0676-G-BH, 2010 WL 4025776, at *6 (N.D. Tex. Sept. 13, 2010), adopted, 2010 WL 4024896 (N.D. Tex. Oct. 13, 2010). See also M.W. ex rel. Williams v. Avilla R-XIII Sch. Dist., No. 09–05098–CV–SW–JTM, 2011 WL 3354933, at *2 (W.D. Mo. Aug. 3, 2011) (quoting Hooker); D.A. v. Pleasantville Sch. Dist., No. 07–4341 (RBK/JS), 2009 WL 972605, at *8 (D. N.J. Apr. 6, 2009) (using same language).

The majority of courts to confront this issue, however, have held that the <u>Winkelman</u> rule *does* apply with equal force to claims brought by parents on their own behalf under Section 504 and the ADA. In so holding, some courts have relied on the parallel statutory rights in both the IDEA and Section 504 of "*any* person aggrieved," to seek appropriate relief in federal court. 29 U.S.C. § 794a(a)(2) (emphasis added); 20 U.S.C § 1415(i)(2)(A) ("[A]ny party aggrieved"). <u>See, e.g.</u>, <u>C.J.G. v. Scranton School Dist.</u>, No. 3:07-CV-1314, 2007 WL 4269816, at *5-6 (M.D. Pa. Dec. 3, 2007). Other courts have highlighted <u>Winkelman</u>'s emphasis on the "importance of parents in the educational role of their children," a general interest untethered to the IDEA alone, to support the extension of <u>Winkelman</u> to Section 504 and the ADA. <u>K.F. v. Francis Howell R-III Sch. Dist.</u>, No. 4:07CV01691 ERW, 2008 WL 723751, at *7 (E.D. Mo. Mar. 17, 2008) (holding that <u>Winkelman</u> extends to Section 504 and the ADA).

I find most compelling the latter decisions acknowledging that <u>Winkelman</u>, despite its concededly heavy focus on the text and structure of the IDEA, recognized the far broader principle that "'a parent of a child with a disability has a particular and personal interest' in preventing discrimination against the child." <u>Blanchard v. Morton Sch. Dist.</u>, 509 F.3d 934, 938 (9th Cir. 2007) (quoting <u>Winkelman</u>, 550 U.S. at 529); <u>B.D.S. v. Southold Union Free Sch. Dist.</u>, Nos. CV-08-1319(SJF)(WDW), CV-08-1864 (SJF)(WDW), 2009 WL 1875942, at *15 (E.D.N.Y. June 24, 2009) (Fuerstein, J.) (citing <u>Blanchard</u>). This extension requires no real stretch: The <u>Winkelman</u> Court itself stressed that parental standing was not only "consistent with the purpose of IDEA," but *also*, "fully in accord with our social and legal traditions." <u>Winkelman</u>, 550 U.S. at 535. "It is beyond dispute," the Court concluded, "that the relationship between a parent and a child is sufficient to support a legally cognizable interest in the education of one's child." <u>Id.</u>

I thus agree with the Ninth Circuit Court of Appeals, Judge Fuerstein of this District, and the many other federal district courts holding that <u>Winkelman</u> standing applies to the parent's independent *pro se* claims against the defendants under Section 504 and the ADA based upon the alleged discriminatory conduct by defendants against J.M., their alleged statutory procedural violations, and the parent's claims of retaliation under the statutes.

That the parent may bring such claims on her own behalf, however, does not in any way alter the longstanding rule that "a non-attorney parent must be represented by counsel in bringing an action *on behalf of* his or her child." <u>Cheung v. Youth Orchestra Found. of Buffalo, Inc.</u>, 906 F.2d 59, 61 (2d Cir. 1990) (emphasis added). The Court "has a duty to enforce the <u>Cheung</u> rule *sua sponte*, for the infant is always the ward of every court wherein his right or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done to him." <u>Wenger v. Canastota Cent. Sch. Dist.</u>, 146 F.3d 123, 125 (2d Cir. 1998), <u>overruled on other grounds by</u> <u>Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516 (2007) (internal quotations, citations, and brackets omitted). Before dismissing the child's claims on this ground alone, a district court must determine whether it is necessary for the court to appoint counsel for the child. <u>See</u> <u>id.</u> (vacating the district court's decision to dismiss a child's claims brought *pro se* by his father where the district court had not first "consider[ed] whether [the child] is entitled to the appointment of counsel.").

It is well settled that there is no right to counsel in civil cases and even where, as here, "without appointment of counsel, the case will not go forward at all," appointment of counsel is not required "when it is clear no substantial claim might be brought on behalf of such a party." <u>Id.</u> <u>Accord</u> <u>Cooper v. A. Sargenti Co.</u>, 877 F.2d 170, 174 (2d Cir. 1989) ("[E]specially a threshold showing of some likelihood of merit, should be borne in mind by trial and appellate

courts in deciding whether to appoint counsel."); Schoon v. Berlin, No. 07 Civ. 2900(JGK), 2011 WL 1085274, at *2 (S.D.N.Y. Mar. 23, 2011) (Koeltl, J.) (denying appointment of counsel and dismissing all claims brought on behalf of child without prejudice where the complaint had "provide[d] insufficient indicia that the claims [we]re likely to be meritorious"); Mills v. Fischer, No. 09-CV-0966A, 2010 WL 364457, at *2 (W.D.N.Y. Feb. 1, 2010) (denying appointment of counsel for *pro se* minor in Section 1983 suit where the claims raised in the complaint were "not likely to be of substance.").

I have considered whether to appoint counsel in this case and decline to do so because J.M. has no "substantial claim" under any theory of law raised in the complaint and further elaborated in papers and evidence opposing the defendants' motions to dismiss and for summary judgment. Accordingly, all claims brought on behalf of J.M. are dismissed without prejudice.

The unusual upshot of both the Winkelman rule for parental standing based upon alleged discrimination against their children, as well as the rule requiring appointment of counsel for minors only where "substantial claims" exist, is that I must still address the merits of all claims implicating the rights of J.M. in this case. Given that the vast majority of the parent's and J.M.'s claims overlap, for ease of reference, I will refer to both mother and son as "the plaintiffs," regardless of the issue of standing.

2.   Whether the Various Forms of Relief Requested By Plaintiffs Are Available

First, the plaintiffs ask the Court to issue an injunction ordering the DOE to heat up J.M.'s homemade lunch and, while not mentioned, I liberally construe the plaintiffs' complaint also to request that J.M. be supervised during lunch/snack time. Compl. ¶ 74. However, I find that these claims for injunctive relief are moot. "Mootness imposes a case-or-controversy

requirement that subsists through all stages of federal judicial proceedings. Throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007) (quoting Spenser v. Kemna, 523 U.S. 1, 7 (1998) (internal citations and quotations omitted). Accordingly, "if there is no reasonable expectation that the wrong will be repeated, then it becomes impossible for the court to grant any effectual relief whatever to the prevailing party." Id. at 167-68 (internal brackets and quotations omitted).

As the plaintiffs clarified in their Memorandum in Opposition to Summary Judgment, sending homemade lunches, reheating them, and supervising J.M.'s food intake would only be needed "until such time that he was able to adjust to the dietary demands of his *newly diagnosed condition*." Opp. Mem. at 6 (emphasis added). J.M. was diagnosed with diabetes in March 2007, nearly five years ago at this point. J.M.'s alleged need for food heating and supervision was contingent on the *newness* of his condition, not to mention his relatively young age. Consequently, ordering such injunctive relief would no longer redress J.M.'s alleged injury. Moreover since one can only be a "newly diagnosed" diabetic once, Id., there is "no reasonable expectation" that this particular wrong will ever "be repeated," at least as to J.M.[19] White River, 481 F.3d at 167.

Second, the plaintiffs ask the Court to order an injunction "to force the DOE to provide all schools with the necessary equipment (cabinets, refrigerators, microwaves/heating devices,

---

[19] By the time litigation commenced in March 2008, J.M. was already more than a year into his diagnosis. By the time that the defendants filed their motion to dismiss in August 2009—the date of filing had been extended on the plaintiff's request—J.M. was already close to two and one-half years into his diagnosis. By the time the motion for summary judgment was fully briefed—January 2011—J.M. had already been diagnosed with diabetes for nearly four years.

etc.) to store, preserve and reheat home-made lunches of students requiring special dietary needs like [J.M.] because he is part of this population." Compl. ¶ 74. I find that plaintiffs lack standing to request such relief. First, to the extent that the plaintiffs, proceeding *pro se*, purport to assert claims on behalf of all other similarly situated students with dietary needs necessitated by diabetes, they may only "appear for one's self, a person may not appear on another person's behalf in the other's cause. A person must be litigating an interest personal to him." <u>Iannaccone v. Law</u>, 142 F.3d 553, 558 (2d Cir. 1998). Second, even if the plaintiffs could bring such a claim for relief on behalf of others, they still would fail to satisfy the "injury in fact" requirement for standing because they have not put forward any evidence that other students with diabetes in New York City have ever requested, let alone required, the accommodations sought by plaintiffs. In other words, the alleged injury is "conjectural or hypothetical" rather than "actual or imminent." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

Third, the plaintiffs ask the Court to issue an injunction to "direct the DOE to fully comply with the protocol/procedures the State has developed to accommodate children with Type 1 Diabetes pursuant to federal laws." Compl. ¶ 74. However, as the Second Circuit has already held, "an 'obey the law' order entered in a case arising under statutes so general as the ADA and Rehabilitation Act would not pass muster under Rule 65(d) of the Federal Rules of Civil Procedure, which requires that injunctions be 'specific in terms' and 'describe in reasonable detail . . . the act or acts sought to be restrained.'" <u>Henrietta D. v. Giuliani</u>, 246 F.3d 176, 182 (2d Cir. 2001) (quoting Fed. R. Civ. P. 65(d) and citing <u>S.C. Johnson & Son, Inc. v. Clorox Co.</u>, 241 F.3d 232, 240 (2d Cir. 2001) ("Under Rule 65(d), an injunction must be more

specific than a simple command that the defendant obey the law.") (internal quotations and citations omitted)).

The plaintiffs' only remaining claim, therefore, is for monetary damages.[20] As developed more fully below, compensatory damages are an available remedy under Section 504, the ADA, and claims properly brought under Section 1983. Although compensatory damages are not available under the IDEA, I still address the substance of plaintiffs' IDEA claims because an IDEA violation may form the basis for a Section 1983 suit. Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2d Cir. 1987) ("[P]arents are entitled to bring a § 1983 action based on alleged violations of the [IDEA]"). Compensatory damages are also available for the plaintiffs' pendant state tort claims.

### C. Plaintiffs' Primary Claim—Section 504 of the Rehabilitation Act

The plaintiffs bring three claims under Section 504. In particular, plaintiffs allege that the defendants (1) failed to provide "reasonable accommodations" for J.M.'s disability, (2) violated plaintiffs' procedural rights under the statute, and (3) improperly retaliated against the plaintiffs for raising complaints under the statute. To the extent that the plaintiffs also assert violations arising under the ADA, this Court will treat both claims "in tandem" and apply all relevant case law interchangeably, as this Circuit has repeatedly held that both statutes "impose identical requirements." Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999). See also Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) ("[W]e treat claims under the two

---

[20] It is unnecessary to address the basis for the requested $40,000,000 in damages because there is none alleged. See Compl. ¶ 74. The plaintiffs claim that at some unspecified point "pending the litigation of the now federal case," the mother "hired an independent food contractor to prepare and deliver a balanced meal . . . to [J.M.] at school on a daily basis." Opp. Mem. at 13. The plaintiffs allege that the contractor cost $125.00 per week, Opp. Mem. at 30, though the Court could not locate any proof of payment in the evidence submitted. I will assume that the plaintiffs are seeking some unspecified sum of compensatory damages to compensate for the alleged cost of the independent food contractor, emotional damages, and lost time required to enforce J.M.'s rights.

statutes identically."). For ease of reading, I will generally only refer to Section 504 in this part, although rights under both Section 504 and the ADA are implicated.

Section 504 does not allow for individual capacity suits. <u>Garcia v. S.U.N.Y. Health Sci. Center of Brooklyn</u>, 280 F.3d 98, 107 (2d Cir. 2001). To the extent that the plaintiffs bring claims under these statutes against the individually named defendants in their *official capacities*, these claims are merely duplicative of the claims against the DOE, the "real party in interest." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Likewise, the claims against the City of New York, District 29, and P.S. 270, are duplicative of the claims against the DOE. Therefore, the Section 504 and ADA claims are dismissed *sua sponte* with prejudice as to the individually named defendants in both their individual and official capacities, as well as the City of New York, District 29, and P.S. 270. I, therefore, need not reach the issue of whether the individual defendants are qualifiedly immune. <u>See</u> ECF Docket # 77, Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def. Mem.") at 12-16.

1. Reasonable Accommodations

The plaintiffs' primary claim against defendants—that defendants discriminated against J.M. by failing to "reasonably accommodate" his disability—falls within the ambit of Section 504 of the Rehabilitation Act, which provides in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ..

29 U.S.C. § 794.[21]

To make out a *prima facie* claim under Section 504, a plaintiff must show: (1) That he has a covered disability; (2) that he was "otherwise qualified" for the benefit that has been denied; (3) that he has been denied the benefits "solely by reason" of his disability or otherwise discriminated against by the defendants; and (4) that the benefit is part of a "program or activity receiving Federal financial assistance." Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998). Discrimination on the basis of a disability includes "not making reasonable accommodations" for a person "otherwise qualified" with a disability. 42 U.S.C. § 12112(b)(5)(A).

Ordinarily the burden of proving that a requested accommodation is reasonable "is not a heavy one." Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995). "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." Id. The burden then shifts to the defendants to show "that the proposed accommodation . . . would cause it to suffer an undue hardship." Id. However, where, as here, a plaintiff seeks *monetary damages*, their burden is far greater: "[M]onetary damages are recoverable only upon a showing of an *intentional* violation." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 275 (2d Cir. 2009) (emphasis in original). To prove intent, a plaintiff need not prove "personal animosity or ill will." Bartlett,  v. New York State Bd. of Law Exam'ns., 156 F.3d 321, 331 (2d Cir. 1998), vacated and remanded on other grounds by New York State Bd. of Law Exam'ns v. Bartlett, 527 U.S. 1031 (1999). Intentional discrimination "may be inferred when a policymaker acted with at least deliberate indifference to

---

[21] The ADA similarly provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." Id. (internal brackets, ellipses, and citations omitted). Deliberate indifference can be shown when: "[A]n official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Loeffler, 582 F.3d at 276 (quoting Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998)).

The defendants concede that diabetes is a covered disability under Section 504, that J.M. is "otherwise qualified," and that the DOE is a "program . . . receiving federal financial assistance." Pfrommer, 148 F.3d at 82; Def. Mem. at 4. The only contested issue is whether J.M. was intentionally discriminated against because of his disability by the defendants' failure to reasonably accommodate J.M.'s asserted need for (1) his homemade food to be reheated at school and (2) his food intake to be supervised during lunch time. For the reasons discussed below, I hold that he was not.

Although under Section 504 "the ultimate question is the extent to which a grantee is required to make reasonable modification in its programs for the needs of the handicapped," Alexander v. Choate, 469 U.S. 287, 300 n. 19 (1985), a government entity is not required to provide every requested accommodation. The principal object of Section 504 is for qualified handicapped individuals to be "provided with meaningful access to the benefit that the grantee offers." Id. at 301. It naturally follows that when an individual already has "meaningful access" to a benefit to which he or she is entitled, no additional accommodation, "reasonable" or not, need be provided by the grantee. Accordingly, before even reaching "the ultimate question," any requested accommodation must first be deemed *necessary* to ensure an individual with

disabilities has "meaningful access" to the benefit in question. Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 410 (1979) ("[R]equir[ing] substantial adjustments in existing programs *beyond those necessary* to eliminate discrimination against otherwise qualified individuals . . . would constitute an unauthorized extension of the obligations imposed by that statute."). See also Borkowski, 63 F.3d at 139 ("[I]f an accommodation *is needed*, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified.") (emphasis added); J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 71 (2d Cir. 2000) (rejecting Section 504 claim where plaintiff "failed to show that [proposed accommodation] was *necessary*") (emphasis added).

"Meaningful access," however, does not mean "equal access" or preferential treatment. As the Supreme Court has cautioned: "Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance . . .. The Act does not . . . guarantee the handicapped equal results . . .." Choate, 469 U.S. at 304 (internal citations omitted). The Second Circuit thus distinguishes between required "reasonable accommodations" and requested "optimal" accommodations not authorized by the disability statutes. J.D., 224 F.3d at 71. See Felix v. New York City Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003) ("[The ADA] does not authorize a preference for disabled people generally."); Fink v. New York City Dept. of Personnel, 53 F.3d 565, 567 (2d Cir. 1995) ("[Section 504] does not require the perfect elimination of all disadvantage that may flow from the disability."). Moreover, where alternative reasonable accommodations to allow for "meaningful access" are offered or already in place, a Section 504 reasonable accommodations claim must fail. Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2d Cir. 2003) ("There would be no need for injunctive relief if the plaintiffs were already being reasonably accommodated.");

Wernick v. Fed. Res. Bank of New York, 91 F.3d 379, 385 (2d Cir. 1996) (affirming summary judgment because "the accommodations offered by the [defendant] were plainly reasonable."); Cave v. East Meadow Union Free Sch. Dist., 480 F.Supp.2d 610, 641 (E.D.N.Y. 2007) (finding no violation where school district denied hearing impaired student the ability to bring a service dog to school where student was afforded other "apparently successful accommodations," which allowed him meaningful access to school).

As an initial matter, I find it necessary to clarify the "benefit" at issue in this case. Both parties erroneously focus on the presence or absence of meaningful access to "educational opportunities," Compl. ¶ 51, or the "educational program of the school," Def. Mem. at 7. It is undisputed, however, that J.M. retained full access to the educational and extracurricular programs of the school, that his disability did not interfere with his academic program, and that he was on grade level in reading and in math. Def. R. 56.1 ¶ 11, 24. Instead, the relevant and appropriate baseline benefit from which to measure the necessity, or alternatively, reasonableness of the accommodations sought by the plaintiffs in this case, is "meaningful access" to *public school lunch*.

In addition to the requirement that federal grantees provide meaningful access for disabled children in academic settings, the federal regulations implementing Section 504 also demand the same for "nonacademic settings," including meals:

> In providing or arranging for the provision of nonacademic and extracurricular services and activities, *including meals* . . . a recipient shall ensure that handicapped persons participate with nonhandicapped persons . . . *to the maximum extent appropriate* to the needs of the handicapped person in question."

34 C.F.R. § 104.34(b) (emphasis added). Thus, "a student may have a viable discrimination claim even if his or her academic performance is satisfactory, provided the student establishes that he or she does not enjoy equal access to the school's programs." J.D., 224 F.3d at 70.

Much like a wheelchair bound student who requires a ramp to access the doors of school will never enter school in the same way as his non-disabled counterpart, once diagnosed with diabetes, J.M. would never again be able to eat his school meals in quite the same way as his non-diabetic peers. The ever-present danger of hyper- or hypoglycemia would forever prevent J.M. from eating school meals without an extra degree of care in deciding what foods to eat and how and when to eat them, as well as close monitoring of his blood-glucose levels. The parent's accommodation requests to have P.S. 270 heat up J.M.'s homemade lunches and supervise his food intake at school were no doubt good faith efforts on the part of a concerned parent intended to 'build a ramp' to allow J.M. to have a varied and appetizing meal during the school day with a reduced risk of hyper- or hypoglycemia. Unfortunately, I cannot agree that any reasonable juror could find that these requested accommodations were *necessary* to ensure that J.M. had meaningful access to school lunches. Therefore, I need not reach the question of whether the parent's accommodation requests were "reasonable" or alternatively, whether they presented an "undue burden" to the DOE. I will address each accommodation request in turn.

The request to heat up J.M.'s homemade food represents the archetype of a preferential, as opposed to a necessary, accommodation.[22] After his diagnosis, J.M.'s parent made the reasoned decision, in collaboration with J.M.'s hospital nutritionist, to send homemade lunches

---

[22] The parent's argument that the accommodation is "necessary," as opposed to a mere "preference" because of "the extraordinary measures," Opp. Mem. at 30, the parent employed including the "numerous phone calls and unending e-mails that she sent to various school officials and department heads," and the facts that she "wrote to prominent politicians," "obtain[ed] a signed petition with 1,000 signatures," and "hire[d] an independent contractor," is unavailing. Opp. Mem. at 30-33. These efforts prove no more than the parent was a passionate advocate on behalf of her son, not that the accommodation she requested was necessary.

to school at least until he became more acclimated to his condition in order to more strictly monitor his diet. Although J.M.'s lunches were homemade, there is no evidence to suggest that he was excluded in any way from eating his homemade lunch with other non-disabled peers during the lunch period. Diabetics do not require hot food and no such claim is made here.[23] Though it is understandable that J.M. – like others with or without diabetes – would prefer to eat food intended to be eaten hot while hot, or eat lunches other than "cold sandwiches" (not to mention any other available cold lunch, salads as but one healthy example), this does not mean the school district was obligated under the applicable disability statutes to accommodate this *preference*. To hold otherwise would transform Section 504 "from an act that prohibits discrimination into an act that requires treating people with disabilities better than others who are not disabled but have the same impairment for which accommodation is sought." Felix, 324 F.3d at 107.

Moreover, there is no evidence to suggest that J.M. was in any way prevented from eating lunches provided by the school, thus compelling the parent to send homemade lunches as a measure of last resort. Instead, the parent made an independent decision at least initially to send J.M. carefully calibrated homemade lunches on the advice of her son's nutritionist, and then continued to do so apparently because J.M. did not like school lunches. See Opp. Mem. at 32 (citing impartial hearing testimony of Dr. Barberis, stating: "I think it is obvious that if he doesn't like school food that the only other viable alternative is for her to prepare food at home that he likes.").

---

[23] The plaintiff concedes that heating J.M.'s food was only "to ensure its (sic) appetizing enough for him to eat all of it," Opp. Mem. at 33, not because it was medically necessary for diabetics to eat hot food. See also Opp. Mem. at 24 ("[A]lthough the student is *not required to eat hot food only*, it is required that the student be provided with food he likes, so that he will eat his entire meal.") (citing impartial hearing testimony of Dr. Barberis).

The parent took grave offense to the suggestion by Superintendent Joyner-Wells that J.M. count his own calories and carbohydrates, especially considering Dr. Barberis's impartial hearing testimony that it is "impossible, virtually impossible" for a child to calculate a diet or a meal which falls reliably within the guidelines set by the dietician. Opp. Mem. at 20. While there may have been a more delicate way to communicate with a parent in the midst of a new and stressful family crisis, the Superintendent's suggestion was not unreasonable, nor did her suggestion foreclose the possibility that J.M. and his parent *could* get assistance from the school in helping to select a nutritionally appropriate diet from its lunch menu if the parent's exclusive focus at that time had not been the issue of heating J.M.'s homemade lunch. Dr. Barberis's testimony aside, evidence demonstrates that diabetic students in New York City public schools are able to choose diabetic healthy foods from the school lunch menu, with or without the help of their parents or their schools. If the parent was concerned that J.M. would be unable to choose an appropriate meal from the school menu, particularly in the short term, the school provided the parent with monthly menus. Moreover, the parent testified at the impartial hearing that she had access to and took advantage of the DOE and OSFS websites, which provided nutritional information that she could have used to assist J.M. in choosing a lunch each day that would have been consistent with his dietary plan. Def. R. 56.1 ¶ 22.

The request to supervise J.M.'s lunch intake to ensure he ate all of his food—whether his lunch was provided from home or at school—similarly represents a preferential, as opposed to a necessary, accommodation. As an initial matter, it is unclear from the record whether the parent ever affirmatively requested this accommodation. The record instead demonstrates that Dr. Barberis's order to supervise J.M.'s food intake—included originally on his April Glucose Form—was an unanticipated result of the parent's *actual concern* over the reheating of J.M.'s

homemade lunch. Nonetheless, the parent makes much of the fact that J.M. was only eleven and thus needed supervision to make sure he ate all of his food. But surely at eleven, J.M. was old enough and aware enough—if appropriately emphasized by and explained by his parent, doctors, or nutritionist—to understand the importance of eating his entire lunch and the potential damaging consequences of his failure to do so. This remains true even though he may have been a newly diagnosed diabetic. In fact, there is every reason to believe that given the new diagnosis, J.M. would have been even more receptive to guidance about his new eating requirements. In the end, Dr. Barberis put it most aptly: "You cannot force a child to eat food he doesn't like." Opp. Mem. at 32 (citing IH Tr. 383).

In any event, the school was already providing reasonable accommodations by closely monitoring daily J.M.'s blood glucose levels *during* lunch to guard against the *very risk* the parent hoped to minimize by requesting that his food intake be supervised: Hyper- or hypoglycemia. See Glucose Worksheet (indicating that blood glucose testing occurred every day at some time during J.M.'s lunch period). As already discussed, the nursing staff for years consistently checked J.M.'s blood glucose levels, J.M. never became hyper- or hypoglycemic, and whenever his blood glucose levels reached the borderline level, his parent was swiftly notified. The parent did not seem so concerned about whether or not the school supervised J.M.'s food intake until testimony began at the impartial hearing. Not once did the parent mention such supervision in any of her voluminous emails to school officials and other city agencies prior to the impartial hearing, see Pl. R. 56.1, Exh. 3, nor was supervision even mentioned as a ground for relief in both of her requests for impartial hearings. See IHR; IHR II; Exh. 15. Likewise, the plaintiffs' request for injunctive relief to this Court only requests that the DOE heat J.M.'s homemade lunch. See Compl. ¶ 74.

But even if I were to find the existence of a genuine issue of material fact as to whether the DOE discriminated against J.M. by failing to provide requested accommodations, which were both necessary and reasonable and that no undue burden existed, no reasonable finder of fact would be able to conclude that this alleged discrimination was the product of "deliberate indifference." See Freydel v. New York Hosp., 242 F.3d 365, 2000 WL 1836755, at *3 (2d Cir. 2000) (unpublished opinion) (finding no violation even where plaintiff "was *clearly denied* the interpreter services she *required* and *was entitled to* under the law" because she "failed to present sufficient evidence to persuade a reasonable jury that [the defendant] acted with deliberate indifference to the likelihood of such a violation.") (emphasis added).

The DOE and school officials appropriately and conscientiously responded to the parent's requests to heat J.M.'s food and for food intake supervision. Ms. Belcher, as the parent acknowledges, was responsive to the parent's concerns and diligent in her efforts to help J.M. even though the accommodations she attempted to provide for J.M. were ultimately deemed unnecessary. Before Principal Andrew discontinued the practice of heating up J.M.'s food, she first called the District Superintendent to ensure that her decision would not in any way violate J.M.'s rights. The Superintendent sought out consultation from "the nursing supervisor" and then "the DOE doctor, Dr. Roger Platt," to ensure that the requested accommodation was not medically necessary for diabetic students and inquired whether any other diabetic students had requested the same accommodation before telling the parent the practice had to terminate. FFD at 5. Further, there is no evidence to suggest that lines of communication were ever cut off; he parent was in constant contact with school and nursing staff and received individualized written responses from the Coordinator of the Child Nutrition Program Administration at the State Education Department, see O'Donnell Letter, as well as the DOE Health Director. See ECF

Docket # 3, Exh. 16, Letter from Blake to the parent, 10/25/2007. Lastly, even assuming Principal Andrew was in receipt of the contested April Glucose Form developed by Dr. Barberis, the request was appropriately forwarded onto DOHMH by the school. That DOHMH did not respond, or that Principal Andrew did not "disclose" the form during the impartial hearing, is insufficient to raise the specter of intentional discrimination or deliberate indifference, let alone a "possible conspiracy to obstruct justice." Compl. ¶ 39.[24] It is at least equally plausible that Principal Andrew and others overlooked the request for food supervision as it was hidden in a duplicate Glucose Monitoring Form and overshadowed by the parent's far more vocal concern about food heating. These claims are mere "conclusory statements, conjecture, or speculation," inadequate to survive summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

Ultimately, because there was no evidence presented of *any* discrimination, let alone a "strong likelihood that a violation of federally protected rights [would] result from the implementation of a challenged policy or custom," Bartlett, 156 F.3d at 331, the plaintiffs have failed to proffer sufficient admissible evidence to persuade a reasonable jury that the defendants acted with deliberate indifference.

For the foregoing reasons, the plaintiffs' "reasonable accommodation" claims under Section 504 and the ADA must be dismissed as to all defendants.

2. Procedural Violations:

Liberally construing plaintiffs' *pro se* pleadings, the plaintiffs additionally allege several procedural deficiencies that may offer an independent basis to find that J.M.'s and the parent's

---

[24] Likewise, the fact that DOE School Chancellor, Joel Klein, failed to respond to a single email from the parent, does not indicate that the parent and J.M. "have been totally ignored and disrespected." Compl. ¶ 56.

rights were violated under Section 504 and the ADA. The plaintiffs allege that the defendants failed to (1) convene a timely meeting to evaluate J.M., Compl. ¶ 40, 45, 54; (2) develop a "Section 504 Plan," Compl. ¶ 40; (3) render a "written decision" denying the parent's requested accommodations, Compl. ¶ 46, 63; (4) engage in an "interactive process" to determine whether the proposed accommodations were reasonable, Compl. ¶ 50; (5) provide information "about diabetic entitlements and/or resources available in the community for children with special needs,"[25] Compl. ¶ 59; and (6) "inform [the parent] about the steps [the parent] should have undertaken to apply for 504/IDEA/ADA/USDA services . . .." Compl. ¶ 61.[26]

This Court finds no cases that squarely address Section 504 *procedural* violations, independent from procedural violations of the IDEA, or the appropriate relief, if any, that would be available if such violations were found. This is most likely because Section 504 affords "[a] recipient that operates a public elementary or secondary education program" wide latitude in fashioning appropriate procedural safeguards. 34 C.F.R. § 104.36. The extent of Section 504's procedural guidance is located in its federal implementing regulations, which mandate the establishment of:

> [A] system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure.

Id. The regulations add that "[c]ompliance with the procedural safeguards of [the IDEA] is one means of meeting this requirement." Id.

---

[25] These claims regarding the alleged failure to communicate are the only alleged basis for the liability of the New York City Office of School Health or the New York City Office of School Food Services. See Compl. ¶ 59.

[26] The plaintiffs also raise a host of procedural errors allegedly committed by the IHO. I address these issues below in the discussion concerning plaintiffs' procedural due process claims, infra Part II.D.3.

The IDEA provides wide-ranging procedural protections. See 20 U.S.C. §1415; Bd. of Educ. v. Rowley, 458 U.S. 176, 205 (1982) (comparing the "elaborate and highly specific procedural safeguards embodied in [the IDEA]" with its "general and somewhat imprecise substantive admonitions . . .."). Despite this "array of procedural safeguards designed to help ensure the education of . . . child[ren]," Polera v. Bd. Of Educ., 288 F.3d 478, 482 (2d Cir. 2002), however, not all procedural violations rise to the level of the denial of a "free appropriate public education," the primary substantive requirement of the statute. Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 (2d Cir. 2003) ("[I]t does not follow that every procedural error in the development of an [Individualized Education Plan ("IEP")] renders the IEP legally inadequate under the IDEA."). In fact, to show that procedural violations constitute a denial of a free appropriate public education, plaintiffs in IDEA cases have a significant burden to overcome. They must show that procedural inadequacies:

> (I) [I]mpeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). The procedural violations in IDEA cases thus must either amount to a *substantive* violation of the statute or "significantly impede[]" parental participation. Id. Given the centrality of procedural compliance to the IDEA, this heightened showing must apply with at least the same force under Section 504.

Even assuming all of the plaintiffs' procedural allegations are true, I cannot find that these violations give rise to a viable claim under Section 504 or the ADA. First, as just discussed, none of the procedural violations ultimately resulted in a substantive violation of J.M.'s rights or "depriv[ed J.M.] of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii)(I), (III). Second, though

it is clear from the record that the defendants' actions did not conform to the DOE's own Section 504 Regulations, I cannot find that defendants' omissions "significantly impeded [the parent's] opportunity to participate in the decisionmaking process regarding the provision of" accommodations under Section 504 or the ADA. 20 U.S.C. § 1415(f)(3)(E)(ii)(II).

Although no formal Section 504 meeting was held during the 2006-2007 or 2007-2008 school years,[27] the parent was in constant communication with school and nursing staff, administrators, and DOE officials about J.M.'s needs. In any event, the primary purpose of such a meeting would have been to "decide whether the student is a qualified individual with a disability pursuant to [Section] 504," and determine "what, if any, accommodations are needed to enable the student to attend school and participate in school activities on an equal basis with his/her non-disabled peers." DOE 504 Regulations § (IV)(C). But J.M.'s Section 504 eligibility was never in question and through an open exchange between the parent and the school, the school determined that only glucose monitoring with an emergency plan would be necessary. See, e.g., Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219 (2d Cir. 2001) (noting in the employment context that an "interactive process" might include "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employees request, and offering and discussing available alternatives when the request is too burdensome.") (internal brackets omitted). That the parent disagreed with the ultimate *decision* the school made does not mean that she was denied participation in the *decisionmaking process* itself.

---

[27] As described as part of the factual background, see supra Part II.E, there is an outstanding dispute as to whether any meeting was actually convened in October 2007 for the 2007-2008 school year.

Although no "Section 504 Plan" was ever formulated, from the beginning of J.M.'s diagnosis, the school maintained and complied with J.M.'s Glucose Monitoring Forms, along with their detailed instructions and emergency plan. Although the parent did not receive a written determination denying her request for accommodations, see DOE 504 Regulations § V(C), she did receive a personal phone call from the District Superintendent explaining the DOE's reasons for the denial and suggestions for available alternative measures. After resubmitting the same accommodation requests on July 13, 2007, the parent subsequently received two detailed written responses from high-ranking city officials within and outside the DOE explaining the reasons for the denial of her accommodation requests. Finally, although the parent may not have been affirmatively provided with any resources concerning students with diabetes or steps the parent should or could have taken to enforce her son's rights under the applicable statutes, from the day J.M. was first diagnosed, the parent was well versed in her and her son's rights and the steps that needed to be taken. She submitted blood glucose monitoring forms and Section 504 accommodation requests to the school, understood the need to "exhaust administrative remedies" under the ADA, Section 504, and IDEA, see Pl. R. 51.6, Exh. 3, and promptly filed a request for an impartial hearing.

Accordingly, because I find that there is no genuine issue of material fact regarding whether either the parent's or J.M.'s rights under Section 504 or the ADA were violated as a result of any alleged procedural errors, plaintiffs' claims are dismissed as to all defendants.

### 3. Retaliation Claim

Lastly, the plaintiffs claim that the DOE denied the parent's daughter admission by lottery to P.S. 270, the same school J.M. attended, in retaliation for the parent's request for

reasonable accommodations for J.M.'s disability and the filing of the instant action in federal court. See Compl. ¶ 11; Opp. Mem. at 65.

Under Section 504, the required elements of a retaliation claim are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action. Weixel v. Bd. of Educ. of the City of New York, 287 F.3d 138, 148 (2d Cir. 2002).

In support of the retaliation allegation, the plaintiffs provide no admissible evidence, but rather only assert the following in their Memorandum in Opposition to the Defendants' Motion for Summary Judgment:

1. The parent "learned from several reliable sources that at least one parent/guardian was granted admission [to the school] for four children in one family." Opp. Mem. at 65.

2. The parent "was questioned [by another parent] why both of her children were not in the same school." Id.

3. Another "parent informed [the parent] that her younger child had been accepted to [P.S. 270] not via the same lottery system that denied admission to [the parent's] daughter." Id. Rather, the other parent's "husband who is a teacher in another district spoke to the principal about his desire to have his child admitted to [P.S. 270], and on that basis, the child was admitted." Id. at 65-66.

I find that the plaintiffs have not put forward *any* proof to "show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory

intent." Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002). Yes, seeking reasonable accommodation of J.M.'s disability "constitutes protected activity under Section 504/ADA," Weixel, at 149, and the plaintiffs do allege facts which demonstrate that the school was well aware of such a request. Yet, the plaintiffs present no evidence to demonstrate why what seems like merely an unlucky school *lottery* outcome could constitute an "adverse *decision* or course of action." Id., at 148 (emphasis added). At the very most, the plaintiffs have suggested, by way of inadmissible evidence, that other students on occasion may have been the "recipient of special favoritism," Opp. Mem. at 66, not that the parent, her daughter, or son were the victims of retaliation.

For the foregoing reasons, I also must grant summary judgment dismissing the plaintiffs' retaliation claims under Section 504 and the ADA as to all defendants.

### D. Alternative Claims

#### 1. IDEA

The plaintiffs additionally invoke this Court's jurisdiction under the IDEA and its federal, and state implementing regulations, alleging that the defendants denied J.M. a free appropriate public education[28] by failing to: (1) Evaluate J.M. after the parent requested an evaluation on July 3, 2007, Pl. R. 56.1, Exh. 15, (2) hold an IEP meeting, (3) develop an IEP, and (4) schedule a second impartial hearing requested on December 26, 2007 to review, in part, the student's IDEA challenge.

It is well settled that "compensatory and punitive damages . . . are not available under the IDEA." Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 247 (2d Cir. 2008). Because

---

[28] New York Education Law and the New State Regulations of the Chancellor parallel the provisions of the IDEA. Accordingly, I will address the plaintiffs' pendent state education law claims in this section.

I have already decided that plaintiffs' claim for compensatory damages is the only relief available in this case, plaintiffs' IDEA claim must be dismissed on this ground alone. However, as plaintiffs may, and in this case, did "sue pursuant to § 1983 to enforce [the IDEA's] provisions-including the right to a [free appropriate public education]-and to obtain damages for violations of such provisions," I must still address the substance of the plaintiffs' IDEA claims. Smith v. Guilford Bd. of Educ., 226 F. App'x. 58, 63 (2d Cir. 2007); see also Quackenbush v. Johnson City Sch. Dist., 716 F.2d 141, 148 (2d Cir. 1983) (permitting "§ 1983 to supply the right of action to a plaintiff who has been denied procedural safeguards under [the IDEA] and who, as a result thereof, has not received the findings and decision following the impartial due process administrative hearing contemplated by" the statute).

The primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). The definition of "children with disabilities" includes students with "other health impairments." 20 U.S.C. § 1401(3)(A)(i). Students with "Other health impairments," in turn, are defined identically in the IDEA's federal and New York state implementing regulations as: "[H]aving limited strength, vitality, or alterness . . . that . . . (i) Is due to chronic health problems such as . . . diabetes . . . *and* (ii) *Adversely affects a child's educational performance*." 34 C.F.R. § 300.8(c)(9); 8 N.Y.C.R.R. § 200.1(zz)(10) (emphasis added).

Thus while the plaintiffs are correct that diabetes, as well as many other "chronic or acute health problems," may be a *necessary* condition for special education eligibility under the IDEA, such a diagnosis is not *sufficient* without a showing of adverse academic impact. As already

discussed at length, however, J.M.'s diabetes did not interfere with his learning and there is no evidence or claim to the contrary.

Thus because J.M. is not covered by the IDEA, plaintiffs cannot claim that defendants violated their rights under the statute, and all IDEA-related claims must be dismissed as a matter of law. J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 70 (2d Cir. 2000) (where a student is "properly found to be ineligible for special education [under the IDEA] . . . *a fortiori* he was not denied a free appropriate public education . . . [and] is not entitled to relief based on [a violation of the IDEA].").

2. Equal Protection:

Plaintiffs assert both race and disability-based discrimination under the Equal Protection Clause of the Fourteenth Amendment, which provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

First, the plaintiffs claim a "good faith belief that [J.M.] . . . has been discriminated against because of his race, color and national origin." Compl. ¶ 11. The only evidence marshaled by plaintiffs, however, appears to be that J.M. "is of Colombian/African-American heritage," Compl. ¶ 4, and that "many of [the parent's] emails . . . were not responded to" and that only after the parent "approach[ed] elected officials and the media" did she receive a reply to requests to heat up J.M.'s food. Compl. ¶ 56. The plaintiffs' race based claim must be dismissed as a matter of law because they have failed to put forward any evidence to suggest that a "government actor intentionally discriminated against him on the basis of his race." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000).[29]

---

[29] Similarly, although the plaintiffs also arguably allege a violation of Title VI of the Civil Rights Act of 1964, see Compl. ¶ 10 (listing "Civil Rights Act of 1964" as one of the statutes, under which J.M. is protected), plaintiffs have

Second, the plaintiffs claim disability discrimination because some education departments in New York State have allowed students to heat their food: "[A] child who receives a right in another district should be afforded the same right as the first child under the due process and equal protection clauses of the 14th Amendment." Compl. ¶ 51. However, "[w]here, as here, a complaint fails to allege an 'intent to disadvantage all members of a class that includes plaintiff,' such a claim is properly dismissed." Weixel, 287 F.3d at 151 (quoting Crawford-El v. Britton, 523 U.S. 574, 594 (1998)) (emphasis added).

Plaintiffs' equal protection claims, therefore, must be dismissed as a matter of law as to all defendants.

### 3. Due Process

The plaintiffs also claim that defendants violated their procedural due process rights by failing to comply fully with the procedural requirements of Section 504, the ADA, the IDEA, and the regulations implementing these statutes. When protected liberty interests like public education, see Goss v. Lopez, 419 U.S. 565, 574 (1975), are implicated, "the government may deprive one of that interest so long as the process afforded provides minimal constitutional procedural protections." Wenger v. Canastota Cent. Sch. Dist., 979 F.Supp. 147, 153 (N.D.N.Y. 1997), aff'd, 208 F.3d 204 (2d Cir. 2000) (citing Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

In the present case, it is undisputed that the plaintiffs were afforded a due process hearing to challenge the alleged deprivations of educational benefits to J.M., allegations which I have already held to be without merit. Instead the plaintiffs challenge the hearing itself, in particular

---

set forth no evidence to prove a *prima facie* violation, which requires, *inter alia*: "[T]hat the defendant discriminated against [the plaintiff] on the basis of race, that that discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant." Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001) (internal quotations and citations omitted).

the IHO, alleging a slew of defects in the proceedings. Alleged defects include that the hearing decision was "untimely" rendered, [30] Compl. ¶¶ 24-25, and that the IHO was biased,[31] Compl. ¶ 48, failed to take into account certain evidence,[32] Compl. ¶¶ 29, 33, 52, denied the parent's request for the appointment of counsel,[33] Compl. ¶ 48, and "abused his discretion" in making improper credibility determinations and factual findings. Compl. ¶ 38.

A thorough review of the nearly 600-page transcript of the five-day long impartial hearing, however, reveals that the IHO made every effort to assist the parent in framing and clarifying her questions, allowed wide-ranging examination of numerous witnesses, including the parent herself, and ensured that the hearing conformed to appropriate procedural safeguards. That plaintiffs were not afforded another due process hearing when requested in December 2007 is immaterial in this case; although the alleged basis for the second requested hearing technically related to a different school year, the exact same underlying right at issue—"meaningful access" to public education through food-heating and supervision accommodations—had already been fully adjudicated by hearing and an appeal to the SRO was pending.

Because plaintiffs were provided with more than sufficient procedural due process, the plaintiffs' claims must be dismissed as to all defendants as a matter of law.

4.   Section 1983

---

[30] See supra note 15.

[31] See Cave, 514 F.3d at 249 ("Absent any evidence casting doubt on the impartiality of the local or the state review officers who would examine [plaintiff's] claims, we cannot presume that they would be biased.")

[32] The contested evidence, which included the parent's closing argument, Compl. ¶ 29, the "petition" signed by one-thousand individuals, Compl. ¶ 33, and the O'Donnell letter tendered one month after the close of testimony, Compl. ¶ 52, were all properly excluded.

[33] See supra note 14.

The plaintiffs additionally assert a Section 1983 action based on the alleged violations of the IDEA, Section 504, the ADA, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Section 1983 provides in relevant part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983. "It is well settled that § 1983 does not create any new substantive rights, but merely provides a federal cause of action for violations of certain federal rights." Mrs. W. v. Tirozzi, 832 F.2d 748, 754 (2d Cir. 1987).

Because I have already held that none of the plaintiffs' federal rights was violated under the IDEA, Section 504, the ADA, Equal Protection or Due Process Clauses of the Fourteenth Amendment, I must dismiss their claims under Section 1983 as a matter of law.

### 5. Intentional and Negligent Infliction of Emotional Distress

The plaintiffs allege a state law claim for intentional infliction of emotional distress, see ECF Docket # 3, Exh. 3, Civil Cover Sheet to Complaint, at 5 (listing among injuries sustained: "Intentional Infliction of Emotional Distress."), and liberally construing the *pro se* pleadings, I will also assume that the plaintiffs meant to allege an alternative state law claim for negligent infliction of emotional distress.

The New York state law tort of intentional infliction of emotional distress "has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). Furthermore, "New York sets a high

threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." Id. (citing Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (N.Y. 1983) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."))

As already described at length, the facts alleged, even if proven by plaintiffs, fall far short of a showing sufficient for a reasonable juror to find the existence of "deliberate indifference" let alone this much higher threshold showing for the tort of intentional infliction of emotional distress. The intentional infliction of emotional distress claim must therefore be dismissed as a matter of law as to all defendants.

Similarly, the plaintiffs' state law claim for negligent infliction of emotional distress also fails as a matter of law. Under New York law, a claim for negligent infliction of emotional distress may arise under the "direct duty" theory if "a plaintiff suffers emotional distress caused by defendant's breach of a duty which unreasonably endangered plaintiffs' physical safety." Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000) (internal brackets and citations omitted). Again as already described at length, J.M.'s physical safety was neither "endangered" because of defendants' actions, nor were defendants' actions "unreasonable."

The negligent infliction of emotional distress claim must therefore be dismissed as a matter of law as to all defendants.

## IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED. All of the plaintiffs' claims personal to the parent are, therefore, dismissed with prejudice. All of

the plaintiffs' claims personal to J.M. are dismissed without prejudice. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
       January 17, 2012

s/ Judge Raymond J. Dearie
_____
RAYMOND J. DEARIE
United States District Judge